UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
JACOB BERGMAN,

    Plaintiff and
    Counterclaim Defendant,

    -against-

UNITED STATES OF AMERICA,

    Defendant and
    Counterclaim Plaintiff.
---------------------------------------------------------x

**OPINION & ORDER**
05-CV-0180 (DLI) (RML)

**DORA L. IRIZARRY, U.S. District Judge:**

Defendant, the United States of America, moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 on Count I of plaintiff Jacob Bergman's ("Bergman" or "plaintiff") complaint, alleging that plaintiff was a responsible person of the former corporation, Empire State Upholstery ("Empire"), pursuant to § 6672 of the Internal Revenue Code, who willfully failed to collect, or truthfully account for and pay over income and Federal Insurance Contribution Act ("FICA") taxes withheld from the wages paid by Empire for the June 30, 2000 and September 30, 2000 tax periods. Defendant further moves to reduce to judgment a trust fund penalty assessed against plaintiff for the unpaid balance of his § 6672 liabilities for the tax period ending September 30, 2000, in the amount of $12,313.15, plus statutory additions and interest from the dates of assessment. For the reasons set forth below, defendant's motion is granted.

## Background

The present suit arises out of Empire's failure to remit to the Internal Revenue Service ("IRS") federal withholding funds in accordance with 26 U.S.C. § 7501(a), and the IRS's efforts to

hold plaintiff personally liable for the unremitted taxes, pursuant to 26 U.S.C. § 6672(a). *See* 26 U.S.C. § 3402 (1988) (requiring withholding of income tax); *id*. § 3102 (1988) (requiring withholding of tax imposed by FICA).

**A.     Empire's Organization and Operation**

    1.     Summer 1999 to November 2000

Empire was incorporated in 1995 by plaintiff to engage in the business of furniture upholstery. (Govt.'s Ex. D; Ex. E at 12.) Plaintiff served as Empire's President and Secretary, 100% shareholder, and only member of the board of directors. (Govt.'s Ex. E at 25.) Plaintiff also invested his own funds in Empire. (*Id*. at 47.) As the sole signatory on Empire's only bank account, plaintiff signed every check that was paid by Empire. (*Id*. at 13, 20-22; Ex. F, Ex. G.) Plaintiff typically signed the paychecks for Empire's employees on a weekly basis. (Govt.'s Ex. E at 39-40.)

Plaintiff's father, Arthur Bergman, was the sole owner of Design Corner, a furniture refinishing, manufacturing and reupholstering business. (*Id*. at 17-18.) Empire and Design Corner were located on different floors of the same building. (*Id*. at 14.) After Arthur was diagnosed with cancer in the summer of 1999, plaintiff and his father combined their businesses and operated under the Empire State Upholstery name until the summer of 2001. (*Id*. at 14-17, 43.) Design Corner's bookkeeper and accountant took over the internal record-keeping and tax return preparation for the operation following the informal merger. (Govt.'s Ex. H at 11-15, 32.)

The parties dispute the manner in which Empire was organized and operated following the summer 1999 merger. Plaintiff contends that his father assumed complete control and domination over Empire's finances, except for the check-signing function, which remained with plaintiff, while plaintiff managed the manufacturing side of the business. Plaintiff testified that Arthur would review

the corporation's bills with the bookkeeper and determine which creditors should be paid. The bookkeeper would then prepare computer-generated checks, and present these checks to plaintiff for signature. (Govt's Ex. E at 56-57; Ex. H at 19-20.) Plaintiff further testified that it was his father's responsibility to pay the taxes. (Govt.'s Ex. E at 53.)

Empire's books and records were kept on a computer "Quick Books" program. Although plaintiff had the right to access the program, he allegedly was unfamiliar with how to use it. (Govt.'s Ex. H at 28-29.) With respect to the mail, Malky Weber, Empire's office manager following the merger, testified that Arthur would pick up the mail on a daily basis until he became too ill to come into the office on a daily basis in or around November 2000. (*Id.* at 29-30.) Arthur also was responsible for hiring and firing Empire's employees following the merger. (Govt.'s Ex. E at 54.) Plaintiff, however, continued to serve as the registered agent for Empire, personally guaranteed Empire's obligations, and managed Empire's employees with respect to processing furniture orders. (*Id.* at 28, 57, 70; Ex. H at 16.) Moreover, plaintiff's signature appears on Empire's corporate income tax returns, as well as Empire's quarterly employment tax returns, Forms 941, for the June 30, 2000 and September 30, 2000 tax periods. (Govt.'s Ex. E at 42-43; Ex. J; Ex. K.)

Empire paid creditors other than the government during the second quarter of 2000 (April 2000 to June 2000). (Govt.'s Ex. M; Ex. N; Ex. O.) Empire's bank statement for the month of April 2000 demonstrates that Empire had a negative starting balance of $5,860.57, collected $145,880.89, and made payments to various payees, other than the IRS, in the amount of $125,821.01. (Govt.'s Ex. M.) Empire's May 2000 bank statement demonstrates that Empire had a starting balance of $14,199.31, collected $191,797.69, and made payments to various payees, other than the IRS, in the amount of $150,105.68. (Govt.'s Ex. N.) In the month of June 2000, Empire had a starting balance

3

of $55,891.32, collected $130,320.19, and directed $183,969.76 in payments to various payees other than the IRS. (Govt.'s Ex. O.) In July 2000, Empire made payments to various payees in the amount of $181,714, which included one $12,598 payment to the IRS on July 24, 2000. (Govt.'s Ex. P; Ex. Q.) With respect to the July 24, 2000 payment, plaintiff testified that "[I]f it says 'IRS' I knew it was paid for taxes. My mind probably told me we are paying off the taxes and pay it off. There is money in the account, just pay it off, whatever." (Govt.'s Ex. E at 102.) However, on August 1, 2000, plaintiff signed a Form 941 for the tax period ending June 30, 2000, as "officer" of Empire that was filed with the IRS and showed a balance of $33,260.62. (Govt.'s Ex. B; Ex. J.) No federal tax deposits were made during the quarter, and no payment was made to the IRS with the Form 941 for the tax period ending June 30, 2000. (Govt.'s Ex. A.)

Although the government concedes that Arthur generally directed plaintiff as to which vendors and creditors should be paid by Empire during the time that he was coming into the office on a daily basis, the government contends that it was within plaintiff's power to pay the IRS during the relevant tax periods because plaintiff did not need his father's authority to write a check, as he continued to be the only signatory on Empire's bank account. (Govt.'s Ex. E at 20-22, 40, 45-46; Ex. F; Ex. G.) Moreover, given that plaintiff signed every check paid by Empire, including the quarterly employment tax returns that indicated balances due, the government alleges plaintiff had to have been aware that Empire was not meeting its payroll tax obligations. (Govt.'s Ex. E at 20-22.)

2. November 2000 to Summer 2001

As Arthur's condition deteriorated toward the end of the year 2000, and until the close of business in the summer of 2001, plaintiff had complete control of Empire's finances and access to Empire's books and records. (*Id.* at 114.) Plaintiff admittedly became aware that Empire was not

4

meeting its payroll tax obligations during that time because he began receiving IRS notices in the mail informing Empire that it was delinquent in its employment tax obligations. (*Id*. at 44-45, 117.) However, he testified that, during the two months preceding Arthur's death in January 2001, until the summer of 2001, checks were generated by the office staff based on prior procedures and then presented to plaintiff for signature. (*Id*. at 22-28.) In contrast, the government contends that plaintiff directed the payments of Empire's funds to creditors other than the IRS during the two months preceding Arthur's death and following Arthur's death. (Def.'s 56.1 Stmt ¶¶ 44-46.) In support of its assertions, the government cites to relevant portions of plaintiff's testimony:

> Q. Did you choose to not be aware of the tax obligations for the merged company?
> A. I don't know what you mean by "choose."
> Q. How is it that your father knew but you did not know?
> A. Because the way we set it up was it was hard for him to come out and deal with the day to day headaches in the shop, so he told me, "You run that. I will take care of the office work."
> Q. But if you are the only one writing the checks - -
> A. Signing the checks.
> Q. Signing the checks, then you would know taxes were being paid or not being paid, so you would know if you signed to the IRS; is that correct?
> A. Yes, that makes sense.
> Q. So you would have been aware if taxes were not being paid?
> A. I might have asked him, "What's going to be with the tax payments?" It might have happened. And he would say, "Don't worry. I am taking care of it."
> Q. But you knew that you weren't signing any checks to the IRS on Empire's account which was the account that you were using for the merged company?
> A. Right . . . .

(Govt.'s Ex. E at 44-45.) Plaintiff further testified:

> Q. You had access to the checks that you were signing?
> A. Right.
> Q. And you could have made payments to the IRS?
> A. If he would have told me to pay.
> Q. Even if he didn't tell you that you could have made payments to the IRS with your corporate checking account?
> A. Technically, maybe.

5

    Q. Do you agree?
    A. Yes.

(*Id*. at 45-46.)

On November 9, 2000, Empire filed its Form 941 for the tax period ending September 30, 2000. The return was signed by plaintiff on November 6, 2000, as "officer" of Empire that was filed with the IRS and showed a balance of $38,226.13. (Govt.'s Ex. A.) No federal tax deposits were made during the quarter, and no payment was made to the IRS with the Form 941 for the tax period ending September 30, 2000. (Govt.'s Ex. K.) However, Empire's bank statement for the month of November 2000 demonstrates that Empire had a negative starting balance of $12,331, collected $224,893, and made payments to various payees in the amount of $192,517, which included corporate checks payable to W.J. Morch in the amount of $5,500.00, Emery Products in the amount of $1,173.68 and $1,166.55, State Insurance Fund in the amount of $2,477.92, and Bank of America in the amount of $1,780.80. (Govt.'s Ex. E at 88-89; Ex. T; Ex. U.) Empire's December 2000 bank statement demonstrates that Empire had a starting balance of $20,045, collected $117,633, and made payments to various payees, other than the IRS, in the amount of $133,832. (Govt.'s Ex. U.)

With respect to whether Empire paid its employees during the two months preceding Arthur's death until the summer of 2001, an Empire employee during the relevant period, Michael Steinmetz, testified that he did not recall there ever being a time when employees were not being paid, and Ms. Weber, testified that, "I am sure we did the payroll, I am sure the payroll was done somehow, otherwise workers wouldn't have come in." (Govt.'s Ex. H at 27; Ex. V at 16-17.) During the year 2000, plaintiff signed paychecks payable to Mr. Steinmetz in the total gross amount of approximately $7,175, and to Ms. Weber in the total gross amount of approximately $8,060, both before netting out

withholding taxes. (Govt.'s Ex. H at 33; Ex. V at 12.)

B.     **Procedural History**

On February 15, 2002, the Internal Revenue Service assessed a trust fund recovery penalty against plaintiff as a responsible person pursuant to § 6672 for Empire's unpaid withholding tax obligations in the amount of $21,541.31 for the tax period ending June 30, 2000, and in the amount of $24,531.56 for the tax period ending September 30, 2000, plus statutory additions and interest. Additional assessments for interest were made on March 25, 2002 in the amounts of $134.97 and $153.71 respectively. Plaintiff has paid his trust fund recovery penalty liability for the tax period ending June 30, 2000 in full, as well as $12,372.12 of the amount assessed against him for the tax period ending September 30, 2000.

Prior to filing the instant lawsuit, plaintiff filed a claim for a refund with the IRS for amounts paid toward the trust fund recovery penalty assessed against him for the tax period ending June 30, 2000, and a claim for abatement for amounts paid towards the trust fund recovery penalty assessed against him for the tax period ending September 30, 2000. On or about January 30, 2004, the IRS disallowed plaintiff's claim for a refund and claim for abatement.

On January 12, 2005, plaintiff brought this action challenging the assessment against him and seeking a refund of the collection in partial satisfaction of the obligation in the amounts of $8,961.87 on Count I and $10,332.40 on Count II of plaintiff's complaint.[1] The government filed a counterclaim seeking to reduce to judgment the balance of the unpaid assessment in the amount of $12,313.15. The plaintiff does not contest the amount of the IRS's assessment, but he does contest

---

[1]Count II of plaintiff's complaint was dismissed pursuant to the parties' stipulation, which was so ordered by the court on May 4, 2006.

7

his liability as a responsible person.

## Discussion

### I. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* ---U.S.---,127 S. Ct. 1769, 1776, 167 L.Ed2d 686 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*. at 1776.

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). However, the nonmoving party may not rely on "[c]onclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998), and must affirmatively "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship.,* 22 F.3d 1219, 1224 (2d Cir. 1994) (citing *Dister v. Cont'l Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir. 1998)).

## II.     26 U.S.C. § 6672

The Internal Revenue Code requires employers to withhold income and FICA taxes from their employees' wages. *See* 26 U.S.C. § 3402 (income taxes); *id*. § 3102(a) (FICA taxes). These withheld sums are held "in trust for the United States," and must be paid over to the IRS on a quarterly basis. 26 U.S.C. § 7501(a); 26 C.F.R. § 31.6011(a)-1 (income taxes), 31.6011(a)-1 (FICA taxes). If the employer fails to remit withholding taxes to the IRS, § 6672(a) of the Code imposes personal liability for unremitted taxes upon any person responsible for the failure to remit. As such, § 6672(a) is a "vital collection tool that cuts through an employer's organizational structure and allows the IRS to impose liability directly and individually on those persons responsible for the tax delinquency." *Fiataruolo v. United States,* 8 F.3d 930, 938 (2d Cir. 1993) (citing *Godfrey v. United States,* 748 F.2d 1568, 1574 (Fed. Cir. 1984)).

In relevant part, § 6672 provides:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully accounts and pays over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties approved by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a). Under this section, a party may be held liable for unpaid withholding taxes if: (1) he was a "responsible person" for collection and payment of the employer's taxes; and (2) he "willfully" failed to comply with the statute. *Fiataruolo,* 8 F.3d at 938 (citations omitted). The person against whom the IRS assesses a § 6672(a) tax penalty has the burden of disproving, by a preponderance of the evidence, the existence of one of these two elements. *Id*.

### A.     Responsible Person

Courts generally take a broad view regarding who qualifies as a responsible person. *Id*. It

9

is not necessary that the individual in question have the final word as to which creditors should be paid in order to be subject to liability under §6672(a). *See United States v. Rem,* 38 F.3d 634, 642 (2d Cir. 1994). The determinative question "is whether the individual had 'significant' control over the enterprise's finances." *Fiataruolo,* 8 F.3d at 939 (citing *Hochstein v. United States,* 900 F.2d 543, 547 (2d Cir. 1990), *cert. denied,* 504 U.S. 985, 112 S. Ct. 2967, 119 L. Ed. 2d 587 (1992)). The "significant control" test "is not meant to ensnare those who have merely technical authority or titular designation." *Id*. Rather, § 6672(a) encompasses "'all those connected closely enough with the business to prevent the [tax] default from occurring.'" *Id*. (quoting *Bowlen v. United States,* 956 F.2d 723, 728 (7th Cir. 1992)). As a result, more than one person can be considered a "responsible person" within the meaning of § 6672(a). *See Rem,* 38 F.3d at 642; *see also Gephart v. United States,* 818 F.2d 469, 476 (6th Cir. 1987) ("[w]hile it may be that [other corporate officials] were *more* responsible than plaintiff, and exercised *greater* authority, this does not affect a finding of liability against the plaintiff." (emphasis in original)).

To determine whether an individual had "significant control," courts have examined whether the person: (1) is an officer or member of the board of directors; (2) owns shares or possesses an entrepreneurial stake in the company; (3) is active in the management of the day-to-day affairs of the company; (4) has the ability to hire and fire employees; (5) makes decisions regarding which, when and in what order outstanding debts or taxes will be paid; (6) exercises control over daily bank accounts and disbursement records; and (7) has check-signing authority. *See Rem,* 38 F.3d at 642. No single factor is dispositive, and the determination of whether an individual had significant control must be made in light of "the totality of the circumstances." *Id*.

All *Fiataruolo* factors are present in this case to plaintiff's detriment. Plaintiff incorporated

Empire in 1995 to engage in the business of furniture upholstery. From Empire's inception until the close of business in the summer of 2001, plaintiff served as Empire's President, Secretary and sole member on the board of directors, owned a 100% ownership interest and invested his own funds in the corporation. Plaintiff also managed the manufacturing side of Empire's business, overseeing its employees with respect to processing furniture orders, served as the registered agent for Empire, and personally guaranteed Empire's obligations. As the sole signatory on Empire's only checking account, plaintiff signed every check that was paid by the corporation, including all payroll checks.

On similar facts, courts in this circuit have held individuals liable as a matter of law. *See e.g., United States v. Landau,* 155 F.3d 93, 100 (2d Cir. 1998) (finding as a matter of law that President, CEO, and sole shareholder was responsible person); *Kalb v. United States,* 505 F.2d 506, 511 (2d Cir. 1974), *cert. denied,* 421 U.S. 979, 95 S. Ct. 1981, 44 L. Ed. 2d 471 (1975) (finding no material issue of fact where individual was CEO, a major stockholder, had check-signing authority, and signed some of the company's tax returns); *United States v. Sage,* 412 F. Supp. 2d 406, 412-23 (S.D.N.Y. 2006) (finding as a matter of law that both CEO and sole shareholder with power to hire and fire employees, corporate check-signing authority, and general control over corporation's financial affairs was responsible person). Moreover, cases where courts in this circuit have denied summary judgment are distinguishable. *See e.g., Fiataruolo,* 8 F.3d at 939-40 (finding material issue of fact where individuals were not officers or employees, were not shareholders, did not have authority to hire and fire, and whose check-signing authority was minimal); *Rem,* 38 F.3d at 644-45 (finding material issue of fact as to titular designation where party was officer, director and 20% owner of the company because the evidence suggested that another individual effectively controlled his actions).

11

Despite the presence of the *Fiataruolo* factors, plaintiff argues that he lacked decision-making authority to determine what creditors, including the IRS, should be paid and when they should be paid. It is undisputed that Arthur generally directed plaintiff as to which vendors and creditors Empire should pay after the informal merger until Arthur became too ill to come into the office in or around November 2000. Arthur would review the corporation's bills with his bookkeeper and accountant from the Design Corner operation and determine which creditors should be paid. Only then would the bookkeeper prepare the computer-generated checks and present them to plaintiff for signature. During the two months preceding Arthur's death until the close of business in the summer of 2001, the office staff generated checks based on prior procedures and presented them to plaintiff for signature. Plaintiff also claims that he had no meaningful access to Empire's books and records because they were stored on a "Quick Books" program, with which plaintiff was unfamiliar and hence, never used. In essence, plaintiff argues that his technical authority by virtue of title, ownership interest, or check-signing authority was merely titular, and that he exercised little actual control over Empire's "purse strings." *Winter v. United States,* 196 F.3d 339, 346 (2d Cir. 1999). However, the evidence in the record "tells quite a different story." *Scott,* 127 S. Ct. at 1775.

As the sole signatory on Empire's only checking account, it was clearly within plaintiff's power to pay the IRS during the subject tax periods. Indeed, plaintiff's signature appears on Empire's corporate income tax returns, as well as Empire's quarterly employment tax returns, Forms 941, for the June 30, 2000 and September 30, 2000 tax periods. Even more compelling, plaintiff admits that he had access to the checks he was signing and could have made payments to the IRS from Empire's corporate checking account:

Q. You had access to the checks that you were signing?

A. Right.
Q. And you could have made payments to the IRS?
A. If [Arthur] would have told me to pay.
Q. Even if [Arthur] didn't tell you that you could have made payments to the IRS with your corporate checking account?
A. Technically, maybe.
Q. Do you agree?
A. Yes.

(Govt.'s Ex. E at 45-46.) Moreover, as Arthur's condition deteriorated toward the end of the year 2000, and until the close of business in the summer of 2001, plaintiff gained complete control over Empire's finances and access to Empire's books and records. Plaintiff testified as much when he responded "I was" to the question, "So who was controlling the business . . . during the last two months before [Arthur] died?" (*Id*. at 114.) During that time, plaintiff directed the payments of Empire's funds to creditors other than the IRS, including specifically, paying net payroll to Empire's employees. An Empire employee during the relevant period, Michael Steinmetz, testified that he did not recall there ever being a time when employees were not being paid, and Empire's office manager, Malky Weber, testified that "I am sure we did the payroll, I am sure the payroll was done somehow, otherwise workers wouldn't have come in." (Govt.'s Ex. H at 27; Ex. V at 16-17.)

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247-48. Here, no material questions as to plaintiff's control of company funds and decision-making authority remain. Accordingly, Bergman is deemed a responsible person under § 6672.

### B.   Willfulness

Even a responsible person may not be held personally liable under § 6672 unless his failure

to collect, account for, or remit withholding taxes was willful. 26 U.S.C. § 6672(a). The principal component of willfulness is knowledge. *Reiff v. United States,* No. 5 Civ. 6855, 2006 WL 3059965, at *10 (S.D.N.Y. Oct. 26, 2006.) A responsible person acted willfully if he (1) knew of the company's obligation to pay withholding taxes, and (2) knew that company funds were being used for other purposes instead. *See Rem,* 38 F.3d at 643 (citing *Hochstein,* 900 F.2d at 548). Thus, failures were "willful" if they were "voluntary, conscious and intentional – as opposed to accidental – decisions not to remit funds properly withheld to the Government." *Kalb,* 505 F.2d at 511 (quoting *Monday v. United States,* 421 F.2d 1210, 1216 (7th Cir. 1970), *cert. denied,* 400 U.S. 821, 91 S. Ct. 38, 27 L. Ed. 2d 48 (1970)). Negligence will not suffice. *Id*. "Willful conduct may also include a 'reckless disregard for obvious and known risks' as well as a 'failure to investigate . . . after having notice that withholding taxes have not been remitted to the Government.'" *Landau,* 155 F.3d at 101 (quoting *Kalb,* 505 F.2d at 511). The payment of net payroll is the equivalent of paying a creditor in lieu of paying withholding taxes. *See Winter,* 196 F.3d at 345-46.

The Second Circuit recognizes a "reasonable cause" exception to § 6672 liability: "A responsible person's failure to cause the withholding taxes to be paid is not willful if he believed that the taxes were in fact being paid, so long as that belief was, in the circumstances, a reasonable one." *Rem,* 38 F.3d at 643 (citing *Kalb,* 505 F.2d at 511). However, even if a responsible person did not know contemporaneously of the company's nonpayment of withholding taxes, he will be held liable for nonpayment if, when he became aware of the delinquency, the company had liquid assets with which to pay the overdue taxes. *Id*. ("Willful conduct also includes failure to investigate or to correct mismanagement after having notice that withholding taxes have not been remitted to the Government.").

14

It is clear from the record that plaintiff was aware of Empire's obligation to pay withholding taxes because, as the sole signatory on Empire's only checking account, plaintiff signed every check on behalf of Empire, including Empire's corporate income tax returns and quarterly employment tax returns, indicating balances due for the June 30, 2000 and September 30, 2000 tax periods. With respect to Empire's $12,598 payment to the IRS on July 24, 2000, plaintiff testified that "[I]f it says 'IRS' I knew it was paid for taxes. My mind probably told me we are paying off the taxes and pay it off. There is money in the account, just pay it off, whatever." (Govt.'s Ex. E at 102; Ex. Q.) On August 1, 2000, plaintiff signed a Form 941 for the tax period ending June 30, 2000, as "officer" of Empire that was filed with the IRS and showed a balance of $33,260.62. (Govt.'s Ex. B; Ex. J.) However, no federal tax deposits were made during the quarter, and no payment was made to the IRS with the Form 941 for the tax period ending June 30, 2000. (Govt.'s Ex. A; Ex. B; Ex. J.) Similarly, on November 6, 2000, plaintiff signed a Form 941 for the tax period ending September 30, 2000, as "officer" of Empire that was filed with the IRS and showed a balance of $38,226.12. (Govt.'s Ex. A.) However, again, no federal tax deposits were made during the quarter, and no payment was made to the IRS with the Form 941 for the tax period ending September 30, 2000. (Govt.'s Ex. K.)

Even if plaintiff did not have actual "knowledge" of Empire's obligations to the IRS during the subject tax periods when his father was still coming into the office every day, plaintiff demonstrated a "reckless disregard for obvious and known risks." *Landau,* 155 F.3d at 101. Empire's accountant, Irving Strauss, testified that he not only "advised Arthur Bergman that he has a big liability to the government which has to be taken care of," but told plaintiff to "take it up with his father . . . ." (Govt.'s Ex. L at 21-22.) In response to such advisories, plaintiff testified that he "*might have* asked [Arthur], 'What's going to be with the tax payments? . . . And [Arthur] would say,

15

'Don't worry. I am taking care of it." (Govt.'s Ex. E at 45) (emphasis added.) In any event, plaintiff admittedly became aware of Empire's failure to remit its payroll tax obligations after Arthur's death because he began receiving IRS notices in the mail. (*Id*. at 44-45, 117.) Plaintiff's admissions are more than sufficient for § 6672 liability. *See Winter,* 196 F.3d at 345-46.

Furthermore, no material issues of fact remain with respect to whether plaintiff directed the payment of Empire's funds to creditors other than the IRS during either the subject tax periods or the two months preceding Arthur's death until the close of business in the summer of 2001. The record reveals that plaintiff directed payments totaling $1,475,024.45 from Empire's bank account between April 2000 and December 2000, only $12,598 of which was paid to the IRS on July 24, 2000 for Empire's employment tax liabilities for the June 30, 2000 tax period. (Govt.'s Exs. M-U.) The record further reveals that plaintiff directed net payroll to its employees during both the subject tax periods and the two quarters after Arthur's death in January 2001, when he was in complete control of Empire's finances. During the year 2000, plaintiff signed paychecks payable to Mr. Steinmetz in the total gross amount of approximately $7,175, and to Ms. Weber in the total gross amount of approximately $8,060, both before netting out withholding taxes. (Govt.'s Ex. H at 33; Ex. V at 12.) As Ms. Weber testified, "I am sure we did the payroll, I am sure the payroll was done somehow, otherwise workers wouldn't have come in." (Govt.'s Ex. H at 27.) Plaintiff's argument that the company did not have liquid assets with which to pay the overdue taxes during that time is therefore rejected.

While the question of willfulness in this context is normally one of fact, *see Hochstein,* 900 F.2d at 548, the court must enter judgment here as a matter of law because no reasonable jury could find in favor of plaintiff. *See Gallo,* 22 F.3d at 1224.

**Conclusion**

For the reasons set forth above, defendant's summary judgment motion to reduce to judgment the $12,313.15 trust fund penalty assessed against plaintiff, plus statutory additions and interest from the dates of assessment, is granted in its entirety. Defense counsel shall submit a proposed form of judgment, containing the appropriate amount, in conformity with this decision. Count I of the complaint is dismissed.

SO ORDERED.

DATED:   Brooklyn, New York
         July 16, 2007

_____/s/_____
DORA L. IRIZARRY
United States District Judge